**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 22 B 13283 |
| MICHAEL W. SWAIN, | ) | |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| RYAN DENNIS and KRISTEN DENNIS, | ) | |
| | ) | Adv. No. 23 A 20 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL W. SWAIN, | ) | Judge David D. Cleary |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter comes before the court following trial on the complaint ("Complaint") of

Ryan Dennis ("Ryan") and Kristen Dennis ("Kristen") (collectively, "Plaintiffs") against Michael

W. Swain ("Defendant" or "Swain"), seeking to deny the dischargeability of a debt owed by

Swain to Plaintiffs pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6). At a trial held on April 22,

2025, the court heard the testimony of three witnesses and admitted numerous exhibits into

evidence.

Having reviewed the papers and pleadings, considered the testimony and exhibits and

heard the arguments of the parties, the court will enter judgment for Plaintiffs on Count I and for

Defendant on Count II.

## I.     JURISDICTION

The court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and the district court's Internal Operating Procedure 15(a).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is proper under 28 U.S.C. § 1409(a).

## II.     FINDINGS OF FACT[1]

On January 17, 2025, this court issued a memorandum opinion ("Opinion") denying the Plaintiffs' motion for summary judgment ("MSJ").  In the Opinion, the court found certain material facts to be admitted and undisputed, and the parties included these facts in the "Uncontested Material Facts" portion of the joint pretrial statement they submitted to the court ("Joint Pretrial Statement" or "JPS").  Those facts are included here, as are the "Additional undisputed facts" in the JPS as well as the facts found by the court after hearing the testimony of the witnesses at trial and reviewing the documents admitted into evidence.

1. At all relevant times, Defendant was the President and 100% owner of S4 Construction, Inc. ("S4").  Defendant controlled the actions and conduct of S4.  Because the actions complained of in the complaint are intentional torts – fraud and conversion – the Defendant is personally liable for his conduct, notwithstanding that his conduct was also for the benefit of S4.  (Opinion, ¶ 1.)

2. On or about September 16, 2019, Plaintiffs and S4 entered into a Builders Agreement (the "Agreement"), for S4 to construct a single-family home for Plaintiffs at the property located at 984 Cherry Street, Winnetka, Illinois (the "House").  (Opinion, ¶ 2; Plaintiff's

---

[1] To the extent any findings of fact are deemed to be conclusions of law, then such findings of fact are adopted as conclusions of law.  To the extent any conclusions of law are deemed to be findings of fact, then such conclusions of law are adopted as findings of fact.

Ex. 1.)  Swain had furnished a draft of the Agreement.  After Plaintiffs' attorney reviewed it and changes were made, Plaintiffs signed it.  (Tr. at 55-57.)[2]

3.   The Agreement provides that if Swain "becomes incapacitated by death or illness and is unable to complete or oversee completion of the construction under this Contract for any reason, any of Owner's funds that have not been consumed, spent or otherwise previously utilized by Builder to purchase labor, services or materials shall be immediately refunded to Owner."  (Plaintiff's Ex. 1; Tr. at 19.)

4.   In the year prior to meeting the Plaintiffs, Swain worked on two projects that had not paid him in full.  (Tr. at 75-76; Plaintiffs' Ex. 43.)  He had other jobs pending while working on the House and was paid for those jobs.  Swain expected that the revenue from those jobs and others that he had in progress would be sufficient to pay for the work on the House.  (Tr. at 120.)

5.   Pursuant to the Agreement, the construction budget for the House (excluding acquisition costs of the land) was $944,850.00.  (Opinion, ¶ 3; Plaintiff's Ex. 1.)

6.   According to the Agreement, Plaintiffs were to pay S4 as follows: (1) $75,000.00 upon signing the Agreement; and (2) a monthly draw request based on the percentage of work completed. (Opinion, ¶ 4; Plaintiff's Ex. 1.)

7.   A "draw request" is common construction terminology that means a contractor is making a request for money. (Opinion, ¶ 15.)

8.   Plaintiffs had considered waiting until they purchased the site on which the House would be built before signing the Agreement.  But Ryan testified that:

Swain suggested that if we are able to give him the deposit earlier, he would be able to hit the ground running once we actually buy it.

---

[2] "Tr." shall refer to the transcript of the trial held on April 22, 2025, which is found at docket # 85.

So I had told him yes, I will pay him the $75,000 deposit before we purchase the house. And I asked him to please not spend a large chunk of that until after we purchase. And to that he responded I make it a point to always -- I make it a point to always be financially responsible with my clients' money. I will be providing sworn statements to show where the money is going.

(Tr. at 17:16 – 18:2.)

9. The Agreement did not require Swain or S4 to create a separate escrow account. (Opinion, ⁋ 5.) Plaintiffs asked Swain about it, "to which he told us that they're expensive, and they weren't necessary because he keeps all of his clients' money separate." (Tr. at 18:9-12; 46.) Kristen remembered Swain "discussing the cons of setting up an escrow account. He had mentioned that it took a lot longer for the house to be built, and he also said it would cost more money in the long run." (Tr. at 130:15-19.)

10. It was not Swain's habit or practice to set up escrow accounts or separate accounts for each job with S4, and he did not have an escrow account or a segregated account for any of the other jobs S4 had pending during the time he worked on the House. (Tr. at 112 and 120.)

11. On September 26, 2019, Plaintiffs made their initial deposit to S4 in the amount of $75,000.00. (Opinion, ¶ 6.)

12. Swain did not tell Plaintiffs that these funds could possibly be used for other debts or projects unrelated to the House, because he presumed in that case, they would not have made the payment. (Opinion, ⁋ 7.)

13. When Swain needed funds during the construction process, Ryan testified that "he was going to send me when [sic] he called sworn statements to show where the previous money had been spent and where he was going to spend the new funds." (Tr. at 16:8-11.) This mechanism was described in the Agreement. (Plaintiff's Ex. 1.)

4

14. Swain testified that he did not tell Plaintiffs that he would provide sworn statements to show how much had been paid out to subcontractors.  He provided the sworn statement attached to the Agreement to give "some idea to the general budgets for various sections of the project[.]" (Tr. at 113:22-23.)  His understanding of these sworn statements (as defined below) was that they would "track payments that have been made by the Dennises to S4 Construction for their project."  (Tr. at 126:9-10.)

15. During the construction project, Defendant requested a total of seven (7) construction draws on the following dates and for the following amounts:

--On September 8, 2020, S4 requested a construction draw in the amount of $100,000.00 (the "September 8, 2020 Sworn Statement").

--On October 21, 2020, S4 requested a construction draw in the amount of $122,229.43 (the "October 21, 2020 Sworn Statement").

--On December 8, 2020, S4 requested a construction draw in the amount of $105,900.00 (the "December 8, 2020 Sworn Statement").

--On January 11, 2021, S4 requested a construction draw in the amount of $76,403.00 (the "January 11, 2021 Sworn Statement").

--On March 12, 2021, S4 requested a construction draw in the amount of $75,850.92 (the "March 12, 2021 Sworn Statement").

--On April 21, 2021, S4 requested a construction draw in the amount of $55,230.00 (the "April 21, 2021 Sworn Statement").

--On July 26, 2021, S4 requested a construction draw in the amount of $70,599.02 (the "July 26, 2021 Sworn Statement").

(collectively, the "Sworn Statements") (Opinion, ⁋ 8; Plaintiffs' Exs. 2 – 8.)

16. Each Sworn Statement begins with the following paragraphs:

    The affiant, Michael Swain (Name), being first duly sworn, on oath deposes and says that he/she is PRESIDENT (Position) of S4 CONSTRUCTION, INC. (Company Name), that he/she has a contract with Ryan and Kristen Dennis, the Owner(s), for GENERAL CONTRACTING (Type of Work) on the following described premises in COOK County, State of ILLINOIS, commonly known as 984 Cherry Ave., Winnetka, IL 60093. (Street Address).

    That, for the purposes of said contract, the following persons have been contracted with, and have furnished or are furnishing and preparing material for, and have done or are doing labor on said improvement.  That there is due and to become due them, respectively, the amounts set opposite their names for materials or labor as stated.  That this statement is a full, true and complete statement of all such persons, the amounts paid, and the amounts due or to become due to each.

    (Plaintiff's Ex. 1; Tr. at 67-68.)

17. Ryan understood this language to mean that "the previous paid amount [in the column Prev. Paid] was the amount paid to contractors."  (Tr. at 23:11-13.)

18. Swain confirmed this understanding in a text message sent on September 8, 2020: "I'm putting together an updated spreadsheet this morning, where the previous payment funds have been used, what the next cash layouts look like and update on budget."  (Plaintiffs' Ex. 13; Tr. at 72-73.)

19. At trial, however, Swain testified that he listed amounts in the Prev. Paid column "to paint a picture to work that was going on to get the permit ready, what had been paid or was about to be paid, just to give them an idea of what was happening."  (Tr. at 114:11-14.) In explaining his answers at a deposition, Swain testified further that the Prev. Paid section of these Sworn Statements showed "a previous payment to S4 for the contract." (Tr. at 123:20 and 124.)

20. To the extent that an amount was listed as "Prev. Paid" on a Sworn Statement for a subcontractor or vendor, and that person had not actually been paid by Swain or S4, then Swain made a false representation. (JPS, ¶ 33.)

21. The construction draws requested from Plaintiffs totaled $681,212.37, and Plaintiffs paid $681,212.37 to S4 pursuant to the Sworn Statements and the Agreement. (Opinion, ¶ 9.)

22. Out of the $681,212.37 that Plaintiffs paid S4 for the House, only $440,028.93 was paid to contractors/subcontractors (including to Defendant and his company S4) that worked on the House per the Agreement. (Opinion, ¶ 10.)

23. Swain and/or S4 used approximately $241,183.44 for expenses that were not related to the House. (Opinion, ¶ 11.)  This is the sum that Plaintiffs seek to have declared nondischargeable.  (Tr. at 54.)

24. The Sworn Statements list all the subcontractors who were used to build the House and reflect the phase that each subcontractor on the Sworn Statements will be used for in building the House. (Opinion, ¶¶ 12-13.)

25. Defendant used some of the same subcontractors listed in the Sworn Statements for other construction projects unrelated to the House. (Opinion, ¶ 14.)

26. Between the time Plaintiffs paid the initial deposit in September 2019, and Swain issued the September 8, 2020 Sworn Statement, the COVID-19 pandemic slowed construction projects.  But by September 2020, Swain had already worked with the architect.  (Tr. at 118-19.)

27. On September 8, 2020, Swain sent Ryan the first Sworn Statement, with a cover email that stated: "The previous paid column shows the allocations of the previous payment." (Plaintiffs' Ex. 2.)

28. At trial, Swain testified that the Prev. Paid column "shows the amount the Dennises had previously paid me."  (Tr. at 77:19-20.)

29. The September 8, 2020 Sworn Statement stated that the Village of Winnetka had been paid $21,727.92 for a building permit.  (Plaintiffs' Ex. 2.)  Plaintiffs paid Defendant for the Village of Winnetka building permit on September 26, 2019. (Opinion, ¶ 17.) However, S4 did not pay for that permit until September 10, 2020, using the Plaintiffs' second draw payment of $100,000.  (JPS, ℙ 36; Opinion, ℙ 16; Tr. at 82; Plaintiffs' Ex. 23.)

30. Swain included the Village of Winnetka on the September 8, 2020 Sworn Statement even though it did not provide material or labor, to account for all the costs associated with the total budget of the project.  (Tr. at 116.)

31. The September 8, 2020 Sworn Statement also stated that Bono Consulting was previously paid $3,750 when in fact it had been paid only $3,200.  (JPS, ℙ 36; Tr. at 25.)

32. The September 8, 2020 Sworn Statement stated that AP Survey had been paid prior to September 8, 2020, in the amount of $2,250.  S4 did not pay AP Survey until April and May, 2021, and the payments totaled slightly less than $2,000.  (JPS, ℙ 37; Tr. at 25-26 and 87; Plaintiffs' Ex. 2.)

33. The September 8, 2020 Sworn Statement included some subcontractors for which Swain had not yet received proposals.  He testified that "[i]t's not uncommon to switch out contractors throughout a project."  (Tr. at 117:9-10.)

34. If Ryan had known that the representations regarding the Village of Winnetka, Bono Consulting and AP Survey in the September 8, 2020 Sworn Statement were not true, he would not have paid Swain on the next draw request of $100,000.  "Because if the numbers there didn't amount to what I paid him, then I have no idea what was actually paid."  (Tr. at 26:12-14.)

35. On September 8, 2020, the same day that Swain asked Plaintiffs for $100,000, the ending balance in S4's bank account was negative $580.91. On that date, Swain wrote a check to Millenium Solutions in the amount of $9,600 regarding 1418 Wilmette, another construction project of his. The next day, he wrote a check to MG Tile Experts for $12,788 and a check to Emilio Construction for $8,000, both for projects other than the House. (Tr. at 83-85; Plaintiffs' Ex. 23.)

36. The October 21, 2020 Sworn Statement stated that LRM Plumbing had previously been paid $21,000. LRM Plumbing never worked on the House and was not paid by S4 for work on the House. (Opinion, ¶ 19; JPS, ¶ 38; Tr. at 28 and 117.)

37. The October 21, 2020 Sworn Statement stated that Golgroup Excavation had been previously paid $30,000. The December 8, 2020 Sworn Statement stated that Golgroup Excavation was previously paid $35,725. S4 did not write checks to Golgroup Excavation until December 11, 2020 and January 8, 2021, and each of those checks were returned for non-sufficient funds. (JPS, ¶¶ 39-40; Tr. at 29, 89-90 and 97.)

38. The October 21, 2020 Sworn Statement showed that the individual entries in the Prev. Paid column totaled $175,000, which showed Ryan "exactly where all of my money had been spent." If the numbers had not added up to $175,000, he "would have not paid him [Swain] the next payment, and I would have required him to -- … I would have asked him where the money went and what he was using it for." (Tr. at 28:4-5 and 10-14.)

39. Swain testified that he did not intend any of the Sworn Statements to indicate or tell Plaintiffs how much of their money had been spent on the House as of the respective dates of those statements. (Tr. at 95.)

9

40. Instead, his entries in the Prev. Paid column intentionally totaled exactly what the Plaintiffs had previously paid, as of that date, regardless of the amount Swain had actually paid subcontractors for work on the House.  (Tr. at 98.)

41. The December 8, 2020 Sworn Statement stated that W&K Construction was previously paid $32,000.  S4 wrote a $16,000 check to W&K Construction dated December 16, 2020.  The January 11, 2021 Sworn Statement stated that W&K Construction had previously been paid $26,000 for siding labor, but W&K Construction did not perform that work on the House. (JPS, ¶¶ 41, 43.)

42. The December 8, 2020 Sworn Statement stated that Classic Windows had previously been paid $23,804.43.  S4's check to Classic Windows was in the amount of $12,632 and was dated February 23, 2021. That check was returned for non-sufficient funds.  (JPS, ¶ 42.)

43. If the December 8, 2020 Sworn Statement had been true and accurate, Ryan would not have given Swain any additional funds.  (Tr. at 31.)

44. The January 11, 2021 Sworn Statement stated that Doors for Buildings was previously paid $1,750, but Doors for Buildings was never paid for work relating to the House. (JPS, ¶ 44.)

45. The January 11, 2021 Sworn Statement stated that First Star Mechanical had previously been paid $14,000. S4's check to First Star Mechanical was for $12,000 and was dated May 4, 2021.  (JPS, ¶ 45.)

46. The January 11, 2021 Sworn Statement stated that J&W Plumbing, Inc. had previously been paid $20,000.  S4 paid J&W Plumbing, Inc. $10,000.  (JPS, ¶ 46.)

47. The January 11, 2021 Sworn Statement stated that JB Roofing had previously been paid $15,000. S4's check to JB Roofing was dated March 23, 2021.  (JPS, ¶ 47.)

48. Ryan testified that if the January 11, 2021 Sworn Statement had been accurate, "I would not have continued the job.  I would have fired Mike[.]" (Tr. at 33:22-23.)

49. When Swain broke ground in October 2020, he told Plaintiffs that construction would take five to six months.  They sold their home in Chicago and moved to a one-year rental in Highland Park.  By March 2021, construction had been ongoing for five months.  Ryan visited the job site nearly every day.  (Tr. at 34.)  "[T]he construction was moving along extremely slow. There were many days I would go there, and it [was] very frustrating to see nobody at the house working or one worker working there."  (Tr. at 34:20-23.)

50. The March 12, 2021 Sworn Statement stated that S4 previously paid Custom Stairz & Railz Inc. $8,250. Custom Stairz and Railz, Inc. did not do any work on the House.  (JPS, ¶ 48.)

51. The March 12, 2021 Sworn Statement stated that S4 previously paid J&K Carpentry $27,500 for cabinets and vanities. J&K Carpentry did not do any work on the House. (JPS, ¶ 49; Tr. at 99.)

52. The March 12, 2021 Sworn Statement stated that S4 previously paid O.D. Gutters, Inc. $3,400 for gutters and downspouts. O.D. Gutters, Inc. did not do any work on the House. (JPS, ¶ 50.)

53. The March 12, 2021 Sworn Statement stated that Prestige Drywall had previously been paid $14,000. S4's check to Prestige Drywall was dated August 3, 2021.  (JPS, ¶ 51.)

54. If Ryan had known the truth about these statements in the March 12, 2021 Sworn Statement, he "would not have paid him more money, and I would have fired him from the job." (Tr. at 36:4-5.)

55. The April 21, 2021 Sworn Statement stated that S4 previously paid Ultimate Millwork $10,500 in two separate line items. S4 never paid Ultimate Millwork for work on the House. (JPS, ¶ 52.)

56. The April 21, 2021 Sworn Statement stated that JMK Electric had previously been paid $14,000. S4's checks to JMK Electric were dated June 29, 2021 and August 4, 2021. (JPS, ¶ 53.)

57. If the representations on the April 21, 2021 Sworn Statement had been accurate, Ryan would not have made the payment Swain requested. (Tr. at 37.)

58. The July 26, 2021 Sworn Statement stated that S4 previously paid Aris Flooring $15,500 for hardwood flooring. S4 never paid Aris Flooring for work on the House. (JPS, ¶ 54.)

59. The July 26, 2021 Sworn Statement stated that Reynoso Electric had previously been paid $21,480. S4's check to Reynoso Electric was dated August 3, 2021. (JPS, ¶ 55.)

60. The July 26, 2021 Sworn Statement states that Leon's Landscape had previously been paid $17,000. S4 did not make any payments to Leon's Landscape relating to the House. (JPS, ¶ 56.)

61. Ryan testified that if the representations on the July 26, 2021 Sworn Statement had been accurate, he "would not have given Mr. Swain any more money." (Tr. at 38:10-11.)

62. On August 16, 2021, S4 wrote a check to Father and Son Flooring for $16,420, with a memo line reading "984 Cherry." S4 did not pay Father and Son Flooring for any work performed on the House. (JPS, ¶ 58.)

63. To the extent that a subcontractor or vendor was listed on a Sworn Statement with no "Amount Due" while in fact there was an outstanding invoice, then Swain made a false representation.  (JPS, ¶ 34.)

64. To the extent that a subcontractor or vendor was listed with an "Amount Due" that was incorrect at the time the Sworn Statement was signed, then Swain made a false representation. (JPS, ¶ 35.)

65. Plaintiffs justifiably relied on Swain's false representations made in each of the Sworn Statements in continuing to pay Swain money and in continuing to contract with Swain with regard to the construction of the House.  (JPS, ¶ 59.)

66. Plaintiffs' reliance on Swain's false representations created the $241,183.44 debt owed by Swain to Plaintiffs.  (JPS, ¶ 60.)

67. Swain's bank statements for May, October and December 2020 as well as January, March, April and August 2021 reflect a minimal, negative, or zero ending balance. (Opinion, ¶¶ 18, 22, 24, 26, 28, 30.)

68. On August 21, 2021, Swain emailed a "revised" budget to Plaintiffs.  (JPS, ¶ 61; Plaintiffs' Ex. 44.)  The revised budget added two columns, "Paid Out" and "Waiver." (Tr. at 101.)

69. Ryan was "terrified" when he reviewed this revised budget, "because there was a new column in it that said Paid Out that had significantly less money paid out than what was in the Previously Paid columns."  (Tr. at 42:17-21.)  The "Paid Out" column totaled approximately $484,000.  (Tr. at 45; Plaintiffs' Ex. 16.)  This was the first time that Swain reported to Plaintiffs what had actually been paid out to each subcontractor.  (Tr. at 125.)

70. The revised budget showed that Golgroup Excavation had been paid $35,725. (Plaintiffs' Ex. 9.) This was wrong. (Tr. at 127.)

71. Ryan texted Swain later that day:

> I'm looking at the file and have another question for you…it shows you've actually paid out $484k to contractors & that we've paid you $681k in draws. When we first discussed doing the build, you said you segregate your clients' funds…do we have an account that has that $197K in it?

(Plaintiffs' Ex. 16.)

72. Swain responded by texting that the "681 includes money to me as fee And general conditions." Ryan then replied: "The 484k included your fee and the general conditions paid so far." (Plaintiffs' Ex. 16.)

73. Swain also stated in that text chain: "I have another 60,000 going out this week coming up[.]" (Plaintiffs' Ex. 16.) In fact, although Swain received $75,000 on August 16, he had a negative bank balance by August 20, 2021. (Tr. at 105-106; Plaintiffs' Ex. 34.)

74. On August 23, 2021, Ryan contacted Swain. Ryan had just received an email from the subcontractor responsible for building the cabinets in the House. He had asked when they expected to have the job done and why they did not have the plans for the build, and was told that "[t]o complete this project we will need 3 months from the date we receive a deposit." (Plaintiffs' Ex. 11.) This "terrified" Ryan, because he "had seen all the way back from the earlier draw statements in March where Swain had said he paid [the cabinet maker] $27,500." (Tr. at 39:18-21; Plaintiffs' Ex. 6.)

75. Swain texted Ryan on August 25, 2021, and asked to meet him at the House. (Opinion, ¶ 31; Plaintiffs' Ex. 16.) Ryan testified that at that meeting the next day, Swain told Plaintiffs that:

> [H]e didn't have any of the $197,000. He told us he came into our job $300,000 in debt, and that he had used our money to pay the past debts and other jobs….

14

[H]e wanted to stay on the job and finish the job. He told us that he pay would [sic] for the painting himself, the tile himself and the carpenter himself….

[W]e agreed that I would leave him on as GC, and we wouldn't give him another penny. I would pay all the subs directly.

(Tr. at 49:1-4; 50:10-12; 51:20-22.)

76. Ryan asked Swain for all the subcontractors' names and numbers so that he could call them to find out what work they had completed. Ryan called each of the subcontractors. (Tr. at 46-47; Plaintiffs' Ex. 9.) After making these calls, Ryan realized that the amount Swain had paid the subcontractors was about $230,000 less than Plaintiffs had paid Swain. (Tr. at 47.)

77. Plaintiffs moved into the House in March 2022. (Tr. at 54.)

78. On August 5, 2022, Plaintiffs filed a state-court action against S4 and Swain, alleging breach of contract, fraud, and conversion. S4 and Swain hired an attorney to represent them; this attorney accepted service on their behalf. Despite hiring an attorney, S4 and Swain never answered or appeared in the state-court action. On October 17, 2022, Plaintiffs filed a motion for default judgment. Before the state court could rule, Swain filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. (Opinion, ¶ 33.)

### III. CONCLUSIONS OF LAW

Plaintiffs seek a finding that their claim against Defendant is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6). Exceptions to discharge are construed strictly against creditors and liberally in favor of debtors. *See Matter of Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998). Plaintiffs bear the burden of proving the elements of each exception to discharge by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991).

### A. Count I: 11 U.S.C. § 523(a)(2)(A) – false representation

Pursuant to 11 U.S.C. § 523(a)(2)(A):

(a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-- …

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

Plaintiffs' first theory of recovery is under the "false representation" prong of this subsection. In order to prove that their claim against Defendant is nondischargeable because it is based on a false representation, Plaintiffs must establish by a preponderance of the evidence that: (1) Defendant made a false representation or omission, (2) that he (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which Plaintiffs justifiably relied. *See Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010) (citations omitted). "A contractor's false affidavit certifying that subcontractors and materialmen have been paid and that there are no mechanic's or materialmen's liens against the property when in fact such subcontractors have not been paid may ... result in a nondischargeable debt under § 523(a)(2)(A)." *Zitt v. Roberts* (*In re Roberts*), Adv. No. 10 A 01298, 2011 WL 4102540, at *5 (Bankr. N.D. Ill. Sept. 14, 2011) (quotation omitted).

Although the court denied the MSJ, it concluded that "there is no genuine issue of fact that Defendant made false representations and that Plaintiffs justifiably relied on those false representations." Opinion, p. 20. Therefore, these issues have been resolved.

The remaining questions of law are whether Defendant knew the representations were false or he made them with reckless disregard for the truth, and that he made those representations with the intent to deceive Plaintiffs.

16

1. **Defendant knew the representations were false or he made them with a reckless disregard for their truth**

In the Opinion, the court ruled that whether Defendant knew his statements were false or acted with a reckless disregard for the truth was a question for trial. "Taking this issue to trial will provide the court with the opportunity to judge the Defendant's credibility on the witness stand as well as any other evidence he presents in support of his position that he did not act with a reckless disregard for the truth." Opinion, p. 13.

Also in the Opinion, this court found that under the Illinois Mechanic's Lien Act, sworn statements are supposed to "accurately reflect the amounts paid or due to a subcontractor[.]" Opinion at 11. While that may be true, the court's inquiry here is what *Swain knew or should have known* about what he wrote in the Sworn Statements.

In their briefs, the parties focused on what Swain thought the "Prev. Paid" column meant. But the evidence adduced at trial revealed that Swain's misrepresentations were more extensive than that. It was not just that Swain included amounts in the Prev. Paid column that had not yet been paid and listed subcontractors with an "Amount Due" that was incorrect at the time the Sworn Statement was signed. He made additional false representations by including subcontractors in the Sworn Statements who *never worked on the House at all*:

-- several of the Sworn Statements included a line item indicating that LRM Plumbing had been paid thousands of dollars. LRM Plumbing *never worked on the House* and was not paid by S4 for work on the House.

-- the January 11, 2021 Sworn Statement stated that W&K Construction had been paid $26,000 for siding labor, but W&K Construction *did not perform that work on the House.*

--the March 12, 2021 Sworn Statement stated that S4 paid Custom Stairz & Railz Inc. $8,250. Custom Stairz and Railz, Inc. *did not do any work on the House.*

17

--the March 12, 2021 Sworn Statement stated that S4 paid J&K Carpentry $27,500 for cabinets and vanities. J&K Carpentry *did not do any work on the House.*

--The March 12, 2021 Sworn Statement stated that S4 paid O.D. Gutters, Inc. $3,400 for gutters and downspouts. O.D. Gutters, Inc. *did not do any work on the House.*

These additional misrepresentations about subcontractors who never worked on the House, when considered in conjunction with the line items in the Prev. Paid column listing amounts paid to subcontractors who had not been paid as well as the line items in the Amount Due column that were incorrect at the time the Sworn Statement was signed, support a finding that Swain knew his statements were false or, at the very least, made all of these misrepresentations with a reckless disregard as to their truth.

An instructive comparison is found in *Chop Foo, LLC v. Fara* (*In re Fara*), 663 B.R. 696 (Bankr. N.D. Ill. 2024).  In *Fara*, the plaintiff made payments to the defendant under a contract that contained a specific payment schedule based upon how much of a construction project had been completed.  Prior to each payment, the defendant submitted payment requests to the plaintiff to pay BJC, defendant's company under contract with the plaintiff.  The requests contained vague statements about the progress of the project and that BJC would soon need to make payment to its subcontractors.  The *Fara* court found that:

> [T]he status of the payment of the subcontractors was never made clear to the court.  While the Plaintiff has shown that Blackburn communicated to him on November 27, 2018, that BJC would "need to start providing [BJC's] sub-contractors their first payments to begin their work" and that BJC would "be placing orders for windows," *a representation that payments needed to be made is not the same thing as a representation that the subcontractors had been paid*. Later, on January 24, 2019, Blackburn represented that "the MEP (mechanical, electrical, plumbing) trades ... [had] all received their initial deposits and [would] now be needing their second payments before beginning their work (50% of their total contract cost)." But the it [sic] was not shown to the court what the amount of those initial deposits was and the Plaintiff's own exhibits show that BJC was in

> fact making payments to subcontractors—including after BJC was terminated from the Project.
>
> Once again, this theory reflects a mere dispute between the Plaintiff and BJC under the Contract and regarding payments outside the contract.  The court cannot conclude that BJC, the Debtor or anyone at the Debtor's behest *materially misrepresented the state of payments to the subcontractors* to induce payments outside of the Contract. This theory also fails.

*Id.* at 729–30 (emphasis added) (citations omitted).

Here, the parties' contract provided that Swain could make monthly draw requests based on the percentage of work completed.  Each time Swain provided a Sworn Statement, he was requesting funds from Plaintiffs in accordance with the Agreement – essentially, "pay me this money because this work has been completed by subcontractors who have been paid these amounts."  When Swain made false representations about which subcontractors had done work on the House, how much they had been paid to date and how much remained due, he was inducing Plaintiffs to make payments that were not actually due under the Agreement.  Unlike the contractor in *Fara*, Swain made numerous and specific false representations regarding the state of payments to subcontractors, including those who either never worked on the House or rendered different services than those disclosed.

Additionally, in his cover email on the very first Sworn Statement, Swain wrote: "The previous paid column shows the allocations of the previous payment."  Yet at trial, when asked whether the September 8, 2020 Sworn Statement represented to Plaintiffs that their initial payment was used to pay the subcontractors listed as previously paid, he answered: "No.  This shows the amount the Dennises had previously paid me." Tr. at 77:19-20.  Why would Swain allocate the Plaintiffs' past payment among different subcontractors if not to provide what he had to know was false assurance to the Dennises that this was how their money had been spent?  As Plaintiffs wrote in their post-trial brief, if this court were to accept Swain's argument, Swain

19

"might as well have provided the Dennises with a one-line receipt of each of their lump-sum payments to him."  Plaintiffs' Post-Trial Brief at 8.

For all the reasons stated above, the court finds that Plaintiffs have shown by a preponderance of the evidence that Swain made the false representations on the Sworn Statements – listing subcontractors with incorrect amounts that were "previously paid" or "due," and including subcontractors who never rendered services at the House – with a reckless disregard for the truth.

### 2. Defendant made those representations with the intent to deceive Plaintiffs

The final question in Count I is whether Swain intended to deceive the Plaintiffs when he made these false representations.  Intent is measured by the debtor's subjective intention at the time of the action. *See Rae v. Scarpello* (*In re Scarpello*), 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002).  "Where a debtor knowingly or recklessly makes a false representation[] which the debtor knows or should know will induce another to act, an intent to deceive may be inferred."  *Dancor Construction, Inc. v. Haskell* (*In re Haskell*), 475 B.R. 911, 921 (Bankr. C.D. Ill. 2012).

Debtors will rarely admit to acting with the intent to deceive or defraud.  Therefore, "the scienter element may be inferred based on the totality of the circumstances."  *6050 Grant, LLC v. Hanson* (*In re Hanson*), 437 B.R. 322, 328 (Bankr. N.D. Ill. 2010).  Courts may also rely on a pattern of representations.

> After all of the evidence has been produced, the court must then determine whether the circumstances, viewed in the aggregate, present "a picture of deceptive conduct" by the debtor, indicating an intent to defraud the creditor.

*Id.*

Having reviewed all of the testimony adduced at trial and the exhibits admitted into evidence, the court finds that Swain intended to deceive Plaintiffs.

First, the evidence showed that Swain was in difficult financial straits during the time the House was under construction.  His bank statements for May, October and December 2020 as well as January, March, April and August 2021 reflect a minimal, negative, or zero ending balance.  Although nearly every debtor who files for relief under the Bankruptcy Code is experiencing some kind of financial strain, "[t]he fact that the Debtor was facing financial deterioration at the time he made the misrepresentations at issue is relevant to his intent in this case." *Id.* at 329.

Moreover, as in *Hanson* there was a consistent *pattern* of statements by Swain to induce Plaintiffs to continue to make payments under the Agreement.  The contract required Plaintiffs to make payments according to "a monthly draw request based on % of work completed." Plaintiffs' Ex. 1.  On Sworn Statement after Sworn Statement, Swain listed subcontractors who were never involved in the construction of the House.  By misrepresenting who was working on the project, Swain kept Plaintiffs in the dark regarding the true status of the construction of the House.

Whether or not the court believes Swain's explanation about his intentions regarding the Prev. Paid columns in each Sworn Statement, it is undisputed that he listed numerous subcontractors as performing work on the House even though he had never retained their services.  Swain testified that the *first* Sworn Statement included some subcontractors from which he had not yet received proposals, because "[i]t's not uncommon to switch out contractors throughout a project." Tr. at 117.  This testimony, however, does not explain the repeated inclusion of subcontractors who never performed work on the House.  Frankly, the court itself can think of no plausible explanation – save one.  Swain listed these vendors on the Sworn Statements to create the illusion that he had more skilled workers involved in the construction of

21

Plaintiffs' House, and more aspects of the construction project moving forward, than he actually did. Why would he want to do that? To deceive the Plaintiffs regarding the status of their project so that they would continue to pay his draw requests.

Finally, even when Swain sent Ryan a "revised" budget in August 2021, one that contained the actual figures of what he had paid various contractors,[3] he made yet another series of false representations. After receiving that revised budget, Ryan confronted Swain (via text message), asking what happened to the $681,000 Plaintiffs had paid when only $484,000 had been distributed to vendors. In reply, Swain wrote:

> The 681 includes money to me as fee And general conditions. And I have another 60,000 going out this week coming up well I keep everything in one account yes I keep track of who gets paid for what job everybody on your job is getting paid in full when they're done or we will be when they are done.

Plaintiffs' Ex. 16.

Ryan immediately pointed out that the $484,000 included Swain's fee and general conditions, so those items were already accounted for. Additionally, the bank statement admitted into evidence as Plaintiffs' Exhibit 34 demonstrated that Swain could not possibly have paid an additional $60,000 that week, because his bank account had a negative balance.

While subsequent misrepresentations do not prove that a debtor had the requisite intent at the time the debt was incurred, *IDES v. Davis* (*In re Davis*), 668 B.R. 580, 601 (Bankr. N.D. Ill. 2025), these particular false representations suggest a continuing effort by Swain to deceive Plaintiffs. *See Hanson*, 437 B.R. at 328 ("Determining whether a debtor had the requisite intent under § 523(a)(2)(A) is, therefore, a factual, subjective inquiry decided by examining all of the relevant circumstances, *including those that took place after the debt was incurred*.") (emphasis

---

[3] Even the revised budget was not completely accurate. It showed that Golgroup Excavation had been paid $35,725, which was not the correct amount.

added).  As Plaintiffs' counsel characterized it during argument in court, Swain was "making false statements to the plaintiff [even] at the moment of truth."  Tr. at 105:2-3.

For the reasons stated above, the court finds that Plaintiffs established by a preponderance of the evidence that Swain intended to deceive them.

**3. The court will enter judgment for Plaintiffs on Count I**

In order to prevail on Count I, Plaintiffs had to establish by a preponderance of the evidence that Swain made a false representation or omission that he knew was false or made with reckless disregard for the truth, that he made that false representation with the intent to deceive, and that Plaintiffs justifiably relied upon that representation.  The court had previously found that Swain made false representations and that Plaintiffs justifiably relied on them.  In sections (1) and (2) above, the court found that Plaintiffs established that Swain knew these representations were false or at least that he made them with a reckless disregard as to the truth, and that he made the representations with the intent to deceive Plaintiffs.

For all of the reasons stated above, the court will enter judgment for Plaintiffs on Count I (false representations).

**B. Count I: 11 U.S.C. § 523(a)(2)(A) – actual fraud**

Plaintiffs' second theory of recovery is that Defendant incurred his debt to them based on "actual fraud."  "In order to except a debt from discharge on the basis of actual fraud, a creditor must establish that (1) a fraud occurred, (2) the debtor intended to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute."  *Davis*, 668 B.R. at 600–01.  *See McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (Fraud "embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth.") (quotation omitted).

Although actual fraud does not *require* a finding that a false representation was made, *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 359 (2016), fraud can be found where a defendant makes misrepresentations. *See McClellan*, 217 F.3d at 892 ("The most common type of fraud involves a deliberate misrepresentation or, what amounts to the same thing, a deliberately misleading omission."). Finding no need to define fraud "for all times and all circumstances," the Supreme Court stated that while fraud "connotes deception or trickery generally, the term is difficult to define more precisely." *Husky*, 578 U.S. at 360. Fraud includes "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 893 (quotation omitted). *See also Fara*, 663 B.R. at 720-21. As the court previously found in the Opinion, Swain made misrepresentations to Plaintiffs in a manner that "cheated" the Dennises in an "unfair way" by which the Dennises were tricked into making payments. Therefore, the first element is satisfied because a fraud occurred.

The second element is whether the defendant intended to defraud the plaintiff. Here, in section III(A)(2), the court found that Swain intended to defraud Plaintiffs. Finally, at trial, the court heard Ryan repeatedly testify that if he had known about the misrepresentations in the Sworn Statements, he would not have paid the draw requests. Therefore, Swain's fraud created the debt that was the subject of this dispute, and the third element of fraud has been established.

For all of the reasons stated above, the court finds that Plaintiffs established by a preponderance of the evidence that their debt was created by actual fraud. The court will enter judgment for Plaintiffs on Count I (actual fraud).

### C. Count II: 11 U.S.C. § 523(a)(6)

11 U.S.C. § 523(a)(6) states:

(a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-- …

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

For Plaintiffs to prevail on this count, they must establish by a preponderance of the evidence that Defendant incurred his debt to them through willful and malicious injury.  As the Seventh Circuit wrote, "[a]n injury is willful within the meaning of section 523(a)(6) only if intended; if it's the result but not the *intended* result of an intentional act, the debt arising from the injury is dischargeable, even if the injury was the result of a reckless act." *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 322 (7th Cir. 2012) (citations omitted).

Conduct is malicious if a defendant acted "in conscious disregard of one's duties or without just cause or excuse." *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 775 (7th Cir. 2013) (quotation omitted).  Putting these concepts together, the Seventh Circuit "imagine[d] that all courts would agree that a willful and malicious injury, precluding discharge in bankruptcy of the debt created by the injury, is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Jendusa-Nicolai*, 677 F.3d at 324.

Plaintiffs contend that Swain's actions were in conscious disregard of his contractual duties to furnish accurate Sworn Statements.  If that contract were mutually terminated, he was required to give Plaintiffs a refund.  Since he used their money while maintaining a minimal balance in his bank account, he "consciously disregarded his refund obligation."  Plaintiff's Post-Trial Brief at 14.  Furthermore, Plaintiffs argue that Defendant always knew he would not be able to reimburse them for the funds he received from them that he used for projects other than the

25

House.  Therefore, he knew that injury to the Plaintiffs was highly likely to result from his actions.

Under the Agreement, however, the refund obligation could be triggered in only three situations, one of which was mooted as soon as Plaintiffs closed on the House.  There was no evidence to suggest that either of the other situations applied.  Indeed, Plaintiffs conceded that none of the conditions precedent to the refund obligation occurred.  Plaintiffs' Response at 10.

In their response to Defendant's Post-Trial Brief, Plaintiffs include a section titled "Swain acted willfully and maliciously."  Yet the substance of the arguments in this section are that "Swain made repeated and intentional false statements in an intentional effort to defraud the Dennises….  He made false statement after false statement to the Dennises to defraud them out of hundreds of thousands of dollars."  Plaintiffs' Response at 12.

While a creditor can "base claims under section 523(a)(6) and other subsections of section 523(a) on the same conduct [,]" *Groom v. Krook* (*In re Krook*), 615 B.R. 479, 488 (Bankr. N.D. Ill. 2020), the arguments proffered by Plaintiffs and the evidence on which they rely do not support a finding that in making these intentional misrepresentations Swain acted willfully and maliciously.

"To fit under § 523(a)(6), the goal of the offender must be *to cause harm*, whereas the goal of the typical fraudster under § 523(a)(2) is to profit financially from any fraud that is committed." *In re Phillips*, 672 B.R. 717, 730 (Bankr. M.D. Tenn. 2025) (emphasis added).  The evidence adduced at trial supports a finding that Swain intended to deceive the Dennises, but Plaintiffs have not established by a preponderance of the evidence that he acted in this manner with the goal of *harming* them.  Instead, the evidence supports a finding that Swain's misrepresentations and fraud were done to allow him to keep various plates spinning long

26

enough to complete construction on the House, walk away with a profit and have the Dennises be none the wiser that he was operating at the edge of solvency.

For the reasons stated above, the court will enter judgment in favor of the Defendant on Count II.

### IV.    CONCLUSION

Plaintiffs seek a judgment finding that the debt owed by Swain to Plaintiffs is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).  For the reasons stated above, the court will enter judgment for Plaintiffs on Count I, finding that the debt is nondischargeable because it was obtained by false representations and fraud.  The court will enter judgment for Defendant on Count II, because Plaintiffs did not establish by a preponderance of the evidence that the debt was obtained by willful and malicious injury.

The parties agreed that "Plaintiff's reliance on Swain's false representations created the $241,183.44 debt owed by Swain to Plaintiffs."  However, the court will not enter a money judgment in that amount.  As the court stated previously in the Opinion, since Defendant's underlying bankruptcy case is a no asset chapter 7 case, and the amount of any money judgment would have no effect on his bankruptcy estate or on a distribution to creditors, the court will restrict its final judgment to its findings on the question of dischargeability.

Date:   December 4, 2025

_____
DAVID D. CLEARY
United States Bankruptcy Judge

27